IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES for the use and benefit of KINGSTON ENVIRONMENTAL SERVICES, INC., a Missouri corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID BOLAND, INC., WESTERN SURETY COMPANY, GRANITE PRECASTING & CONCRETE, INC., and HAWAII GEOPHYSICAL SERVICES, LLC,<br><br>Defendants,<br><br>and<br><br>UNITED STATES for the use and Benefit of DAVID BOLAND, INC.<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>KINGSTON ENVIRONMENTAL SERVICES, INC. and BERKELY REGIONAL INSURANCE COMPANY,<br><br>Counterclaim Defendants. | CIVIL NO. 16-00205 DKW-RLP<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND STAYING CASE** |

**INTRODUCTION**

Defendants David Boland, Inc. ("Boland") and Western Surety Company ("Western Surety") seek partial summary judgment on Plaintiff Kingston Environmental Services, Inc.'s ("Kingston") claims under the Miller Act, 40 U.S.C. § 3133 *et seq.*, and for breach of contract. The present dispute turns on whether Kingston, the subcontractor on a government construction project, must comply with a contractual administrative procedure before pursuing its claims in a civil action against the general contractor, Boland. Because the subcontract between the parties requires Kingston to first exhaust the "contractual remedial procedure" applicable to claims for which the government is or may be responsible, the Court GRANTS IN PART Defendants' Motion for Partial Summary Judgment ("Motion") and STAYS this action pending resolution of those proceedings.

**BACKGROUND**

**I.    The Project And Subcontract**

Boland is the prime contractor (Contract No. W9128A-12-C-0009 or "Prime Contract") on an infrastructure construction project for the United States Army Corps of Engineers ("USACE") that is nearing completion at Wheeler Army Airfield, Oahu, Hawaii (the "Project"). Western Surety issued performance and payment bonds on behalf of Boland for the Project. Complaint ¶¶ 10–11. Boland

subcontracted with Kingston to provide labor, materials, equipment, and services ("Subcontract").[1]

Kingston contends that Boland mismanaged the Project, which had an original completion date of approximately May 2015. It argues that Boland willfully and repeatedly interfered with Kingston's work by generally failing to facilitate a productive relationship with the USACE and by failing to resolve issues as they arose. Kingston alleges that Boland: prevented Kingston from accessing construction areas as planned; added unexpected restrictions to the work; failed to identify no-work areas prior to contracting with Kingston; failed and disregarded coordination of the work of the trades; failed to complete other activities on site that disrupted and negatively impacted Kingston; unreasonably revised safety requirements in a manner that added great expense to the work; exhibited constant indecision; changed site access points due to incomplete Boland work; failed to have areas ready for Kingston to perform its work; redirected Kingston's planned work causing disruption; failed to develop a coherent schedule and failed to update the schedule in a timely and organized manner; failed to let subcontractors have access to and review the schedule; failed to work with the subcontractors to timely achieve resolution of issues as they came up on the Project; artificially manipulated

---

[1] Kingston's 2012 Subcontract is attached as Exhibit A to the Declaration of Craig Hildebrandt, Dkt. No. 116-1, and as Exhibit B to Boland's Concise Statement of Facts, Dkt. No. 116-2.

schedules; suffered excessive turnover and lack of continuity by Boland Project personnel; and generally failed to communicate and timely react when presented with information at meetings with the USACE. *See* Kingston Ex. B, Decl. of Bob Wysocki ¶¶ 4–5; Dkt. No 134-2.

According to Boland, however, shortly after arriving on site in November 2012, Kingston encountered difficulty maintaining the Project schedule because of problems finding labor and equipment to perform the work. Boland Ex. A, Decl. of Craig Hildebrandt ¶ 22; Dkt. No. 116-1. It acknowledges that the Project is behind schedule, and that its management of the Project may have been "below average" due to its "strained relationship" with the government, but asserts that the majority of the issues forming the basis for Kingston's claims against Boland are issues for which the USACE is or may be responsible. Kingston Ex. A, 7/19/17 Hildebrandt Dep. at 83–85; Dkt. No. 134-1.

In March 2014, with approximately 46% of its work completed, Kingston negotiated Change Order No. 10 with Boland, which removed the final $8.4 million of work from Kingston's Subcontract. *See* Wysocki Decl. ¶ 8; Boland Ex. C (3/6/14 Change Order No. 10); Dkt. No 116-3. According to Kingston, this "descoping" resulted from its "recogni[tion] that Boland's mismanagement would continue through completion of the Project, [and desire] to avoid similar cost overruns on the second half of its scope." Wysocki Decl. ¶ 8. Change Order No.

4

10 preserved Kingston's right to bring cost-overrun claims against Boland for which prior written notice had been given.²

Kingston filed this action on April 29, 2016, seeking payment from Western Surety under its Miller Act bonds (Count I) and alleging that Boland breached the Subcontract (Count II). Complaint ¶¶ 38–50. From the execution of Change Order No. 10 on March 6, 2014, until the filing of its Complaint, Kingston did not submit any requests to Boland to sponsor or submit to the government any claims for which the USACE might be responsible for Kingston's losses, except with regard to (1) differing topographical conditions and (2) nonconforming manholes supplied by a third-party.³ The parties dispute whether Kingston may pursue the claims asserted here prior to exhausting the contractual remedial procedure specified in the

---

²The parties agreed to waive and release all claims resulting from delays in performance and the schedule impacts of such delays except for "any claims related to delays associated with the issues experienced on this Project about which Subcontractor has previously notified Contractor in writing, including but not limited to letters, emails, daily reports, meeting minutes, RFIs and/or extra work orders." Boland Ex. C at 9.

³Kingston attributed at least a part of its losses with respect to these two issues to USACE, and, pursuant to the contractual remedial procedure at issue here, submitted to Boland documentation to support the alleged impact and costs. The first claim resulted from a topographical error in the USACE drawings. Kingston seeks to recover $247,500 of compensation that Boland has been paid by the USACE on this claim, but which Boland has refused to pay Kingston—this portion of Kingston's claim, however, is not the subject of Defendants' Motion. *See* Mem. in Opp'n at 7 n.2. The second claim involved the installation of sanitary sewer manhole covers that did not meet contract specifications. The USACE rejected the non-conforming manhole covers, and directed Boland to remove and replace them. Boland, in turn, directed Kingston to remove and replace them, which was accomplished after some delay. Kingston requested that Boland sponsor and present its $3.5 million claim to the USACE based upon the doctrine of economic waste. When that claim against the USACE was denied, Boland sponsored in its name a claim against the government before the United States Court of Federal Claims, which appeal remains pending. *See* Hildebrandt Decl. ¶ 13. Like the topographical issue, the manhole-related claim is not a part of this Motion.

5

Subcontract, as Kingston had done with the aforementioned topographical and manhole issues.

## II. Motions To Stay And For Partial Summary Judgment

Prior to filing the present Motion, Boland and Western Surety filed a Motion to Stay Proceedings in Accordance with Terms of Subcontract Agreement Between Parties to Exhaust the Administrative Remedies, on June 12, 2017 ("Motion to Stay"). Dkt. No. 113. Boland and Western Surety moved to stay this action and enforce the administrative remedies outlined in Subcontract Paragraph 13A, which provides that any claims by Kingston against Boland for which the USACE "may be responsible" must be pursued first by Boland on behalf of Kingston through the remedial procedures set forth in the Prime Contract between Boland and the USACE. Paragraph 23 of the Subcontract, entitled "Waivers and Stays," provides that Kingston agrees to stay any action pending the complete and final resolution of the Prime Contract's contractual remedial procedure as required by Paragraph 13. On July 11, 2017, the magistrate judge denied the Motion to Stay. Order Denying Defs.' Mot. to Stay, Dkt. No. 121. On July 21, 2017, Defendants filed a Motion for Reconsideration of that denial. Dkt. No. 127.

On June 16, 2017, Boland and Western Surety filed the present Motion, which contends that: (1) Kingston has failed to comply with the contractually mandated remedial procedure in Subcontract Paragraph 13A, which is a condition precedent to

the present civil action, and which requires dismissal of Kingston's claims; (2) Kingston's claims are barred by Subcontract Paragraph 12B's "no damage for delay" clause; and (3) Kingston's modified total cost claim theory on damages fails in the absence of evidence to support such a theory.[4] *See* Mot., Dkt. No. 115. Kingston maintains that because it seeks remedies solely based upon Boland's mismanagement of the Project—not relating to any conduct attributable to the USACE—the contractual remedial procedure upon which Boland relies is not applicable.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

The Court concludes that Boland and Western Surety are entitled to partial summary judgment because, under the terms of the Subcontract, Kingston expressly agreed to stay any civil action against Boland and Western pending resolution of the contractual remedial procedure relating to claims for which the USACE may be

---

[4] At the August 25, 2017 hearing, movants withdrew the third basis for their Motion—regarding Kingston's modified total cost claim—and acknowledged that discovery taken subsequent to the filing of the Motion revealed issues of fact that preclude summary judgment on this portion of their Motion. *See* Dkt. No. 139 (8/25/17 Court Minutes). The Court therefore does not further address Kingston's modified total cost approach at this time.

7

responsible. Although Kingston vigorously disputes the applicability of the pass-through provisions, given the underlying nature of its claims and current theory of damages, it is enough that the government *may* be responsible for Kingston's losses. As detailed below, notwithstanding its focus on Boland's alleged mismanagement, Kingston previously pointed to the USACE's role in certain delays and errors. Because the government *may* be responsible for the claims asserted here, the determination of whether or to what degree the USACE is responsible for Kingston's losses is to be made in the first instance by the appropriate agency Contracting Officer or board designated to hear such claims according to the unambiguous terms of the Subcontract.[5]

Because the Court grants in part Defendants' Motion with respect to the application of Subcontract Paragraphs 13A and 23, it does not reach movants' additional arguments as to Subcontract Paragraph 12B, the "no damage for delay" clause, or whether an exception to that provision applies under the circumstances. The Court reserves ruling on those issues—and others raised by the parties in their briefing—pending the resolution of the contractual remedial procedure outlined in Paragraph 13A and stays this action as contemplated by Paragraph 23.

---

[5]*See generally* Federal Acquisition Regulation, 48 C.F.R § 52.233-1 Disputes (as described in Prime Contract between Boland and USACE and incorporated in Subcontract Paragraph 13A).

**I.     The Subcontract Requires A Stay Of This Action Pending Resolution Of the Prime Contract's "Contractual Remedial Procedure"**

    **A.     Contractual Provisions**

The Subcontract between Kingston and Boland requires Kingston to exhaust its administrative remedies where the USACE may be responsible before pursuing claims against Boland or Western Surety.  Paragraph 13A provides:

> The contractual remedial procedure described in section 0700-Contract Clauses, 52.233-1 Disputes, (JUL2002) of the Prime Contract [between Boland and USACE] relating to claims for which the Owner may be responsible is specifically incorporated herein by reference and made a part of this Subcontract Agreement.  The Subcontractor shall first pursue and fully exhaust said procedure before commencing any other action against the Contractor or its surety for any claims it may have arising out of its performance of the Work herein.  Upon the Subcontractor's written request, the Contractor agrees to prosecute all claims submitted by the Subcontractor under the contractual remedial procedure of the Prime Contract on behalf of, and to the extent required by, the Subcontractor.  The Subcontractor agrees to be responsible for preparation and active prosecution of the claims to the extent permitted and shall reimburse the Contractor all of its expenses and costs, including attorneys', paraprofessional, and expert fees, incurred by the Contractor on behalf of the Subcontractor.  Final determination of the Subcontractor's claim(s) by the appropriate board or court shall be final and binding on the Subcontractor and the Contractor shall have no further liability, responsibility, or obligation to the Subcontractor except as may be otherwise provided in this Subcontract Agreement.

The Subcontract also requires that Kingston's claims be stayed pending the final resolution of proceedings under Paragraph 13A's contractual remedial procedure.  Paragraph 23 provides in full:

9

> If the Prime Contract incorporated herein is one for which the Contractor has provided any bond(s) pursuant to 40 U.S.C. §270a, the "Miller Act," or if the Prime Contract is with a state or local governmental agency or authority for which the Contractor has provided any bond(s) pursuant to a state or local code, statute, rules and/or regulations, which the Subcontractor hereby acknowledges so determining, then the Subcontractor expressly agrees to stay any action or claim under this Subcontract Agreement against the Contractor and against the Contractor's surety and its Payment Bond and Performance Bond pending the complete and final resolution of the Prime Contract's contractual remedial procedure or the Subcontract Agreement's mediation procedure, as required by Paragraph 13, above. These terms in no way excuse or stay the Subcontractor's filing of any and all notices as required by statute or bond.

The parties dispute the applicability of these provisions.

### B. The USACE *May* Be Responsible For The Claims At Issue

Kingston argues that it seeks compensation for delays and cost-overruns based exclusively on Boland's poor Project management, rendering Paragraph 13A inapplicable. Boland asserts that Kingston's claims include those for damages based on differing site conditions, safety restrictions and work-site access restrictions, and discrepancies in specifications and drawings, attributable to the government. According to Kingston, these are not pass-through claims for which the USACE is or may be responsible for purposes of Paragraph 13A. The record in this matter, however, is to the contrary.

Although it frames its current claims for damages as attributable only to Boland's mismanagement, Kingston has pointed to the conduct of the USACE as

one source, among others, of delay during the course of the Project. For example, in a July 17, 2013 letter from its President, Robert Wysocki, to Boland's Construction Manager and on-site Project Manager, Kingston lists conduct by the USACE as contributing to the "costs, delays, and impacts [Kingston] continue[s] to experience[.]" Ex. C to Hildebrandt Decl. (7/17/13 Wysocki Letter); Dkt. No. 116-1.[6] Some of the issues identified in the letter as attributable to the government include:

- *Airfield fence demolition*: A non-directional beacon ("NDB") shown on drawings does not indicate that work cannot be performed within 100' radius of the NDB. "But during performance of the work, USACE/Boland elected to put the new 100' radius restriction in place concerning the NDB. Boland directed Kingston by email on 6/20/13, that Kingston was not to work within this radius and fence line." 7/17/13 Wysocki Letter at 1–2.

- *Blast arc in area G west*: The contract documents fail to reference construction restrictions due to the explosive arc in area G west. Although Kingston advised Boland of its plan to use the area as a lay down/material storage area to stockpile concrete during the initial mobilization phase, when Boland "passed this on to the USACE on 12/11/12 [it] was told that no storage/lay down would be allowed in the blast arc area. The undisclosed restriction resulted in additional costs for Kingston to reconfigure the demo plan and inefficiencies in the work flow." 7/17/13 Wysocki Letter at 2.

- *Conflicts between plans and specifications concerning backfilling box culvert*: Kingston was not able to backfill the culvert trench because of an inconsistency between contract drawings and specifications. "The specification clearly states that native fill material is considered 'satisfactory' for fill purposes. However, USACE/Boland has refused to allow use of

---

[6]The July 17, 2013 letter is also referenced in Kingston's Answers to Defendants' First Request for Answers to Interrogatories, served on January 25, 2017, attached as Ex. B to Hildebrandt Decl. Dkt. No. 116-1.

11

excavated material for backfilling the culvert trench."   7/17/13 Wysocki Letter at 3.

- *The redesign of the Airdrome Road gravity sewer*: Because numerous intersections to the gravity sewer are not shown on contract drawings, Kingston submitted a Request for Information ("RFI"), seeking direction on how to proceed.   "After subsequent discussion concerning responsibility for redesign, the USACE responded to subsequent RFI No. 62 on 4/1/13 advising that a redesign was being undertaken by the agency.   To date, no redesign has been received.   This is prohibiting commencement of the work in this area and eating into the time allowed for completion of this part of the project. Kingston intended to start this work in early February, 2013.   The lack of resolution of this issue will cause this work (once commenced) to be completed later than the scheduled date and will result in additional cost." 7/17/13 Wysocki Letter at 3.

- *The creation of a hovering area*: "The limits of the low-fly zone are not labeled as such on the contract drawings, nor are any restrictions identified for working in the area.   The new restrictions that USACE/Boland dictated in this area have created significant additional costs and inefficiencies.   The new restrictions have prevented Kingston from completing its work in this area in the planned and orderly fashion, have resulted in longer hauls, and have resulted in interruptions and the area being 'piecemealed' a section at a time.   Boland needs to coordinate a resolution of this issue with USACE (i.e. the establishment of a potential alternate 'low-fly' zone)."   7/17/13 Wysocki Letter at 4.

- *The constant direction to perform piecemeal work in different areas of the site*: "Boland has been totally unsuccessful in coordinating timely resolution with USACE to critical issues. . . . USACE/Boland have so drastically changed and disrupted this site; it no longer even resembles the originally planned job."   7/17/13 Wysocki Letter at 5.

- *The lack of communication*: "We need to ensure that the information is being timely provided to USACE and that USACE understands the time sensitivity and critical nature of the issues.   The status of this project reflects that Boland and USACE have not been able to effectively resolve issues to date. . . .   We need to be directly involved in all future communications with USACE

regarding the unresolved issues that continue to negatively affect our work." 7/17/13 Wysocki Letter at 5.

*See* 7/17/13 Wysocki Letter. *See also* Kingston's Answers to Defs.' First Req. for Answers to Interrogs. at 21, attached as Ex. B to Hildebrandt Decl. ("As with Kingston's other work, Boland and the USACE continuously harassed excavation crews concerning their means and methods for construction [of detention basins.]").

In addition to the conduct of the USACE identified in the July 17, 2013 letter, Kingston's Project Manager David Fisher confirmed at his August 10, 2017 deposition that at least a portion of Kingston's economic losses originated from "differing site conditions" caused by discrepancies in contract drawings and specifications, and from government safety restrictions. *See, e.g.*, 8/10/17 Fisher Dep. at 43–46 (discussing blast arc restrictions in area G), *id.* at 53–54, 63–64 (discussing delays due to contract drawing discrepancies provided by the government and differing site conditions), *id.* at 73–74 (discussing Airdrome Road gravity sewer redesign required by the USACE), *id.* at 100–02 (discussing government-imposed safety restrictions around low-fly zone); Dkt. No. 135-1. Fisher, like Wysocki, primarily faulted Boland for not adequately resolving issues with the USACE or with other subcontractors and for not properly managing those relationships, but also acknowledged that "government-imposed restrictions that [Kingston was] not warned about [from] the drawings caused [it] some economic impact." *Id*. at 103.

regarding the unresolved issues that continue to negatively affect our work." 7/17/13 Wysocki Letter at 5.

*See* 7/17/13 Wysocki Letter. *See also* Kingston's Answers to Defs.' First Req. for Answers to Interrogs. at 21, attached as Ex. B to Hildebrandt Decl. ("As with Kingston's other work, Boland and the USACE continuously harassed excavation crews concerning their means and methods for construction [of detention basins.]").

In addition to the conduct of the USACE identified in the July 17, 2013 letter, Kingston's Project Manager David Fisher confirmed at his August 10, 2017 deposition that at least a portion of Kingston's economic losses originated from "differing site conditions" caused by discrepancies in contract drawings and specifications, and from government safety restrictions. *See, e.g.*, 8/10/17 Fisher Dep. at 43–46 (discussing blast arc restrictions in area G), *id.* at 53–54, 63–64 (discussing delays due to contract drawing discrepancies provided by the government and differing site conditions), *id.* at 73–74 (discussing Airdrome Road gravity sewer redesign required by the USACE), *id.* at 100–02 (discussing government-imposed safety restrictions around low-fly zone); Dkt. No. 135-1. Fisher, like Wysocki, primarily faulted Boland for not adequately resolving issues with the USACE or with other subcontractors and for not properly managing those relationships, but also acknowledged that "government-imposed restrictions that [Kingston was] not warned about [from] the drawings caused [it] some economic impact." *Id*. at 103.

In opposition to Boland's Motion, Kingston insists that because it only seeks damages from Boland, none of these matters constitutes a pass-through claim for which the USACE is or may be responsible. Kingston's own communications during the course of the Project and in this litigation, however, reveal questions of fact regarding the role of the government in its losses. To the extent the issues described above caused a change in the work for which Kingston seeks compensation, the differing site conditions, government-imposed restrictions on access and safety restrictions, and conflicts in contract specifications and drawings amount to claims for which the USACE *may* be responsible, whether or not Kingston chooses to seek payment from USACE.

Put another way, although it frames its theory of damages as solely targeting Boland's chronic Project mismanagement, Kingston's characterization fails to account for the effect of government-imposed restrictions on its losses, which Kingston itself admits were impossible to track with complete accuracy. As recognized by courts facing similar characterizations, although "Plaintiff asserts [Defendant's] 'poor planning and coordination,'" are to blame, that assertion "fails to recognize the effect of Owner-directed scope changes and Owner-caused delays." *United States v. Bhate Envtl. Assocs., Inc.*, 2016 WL 544406, at *3 (D. Alaska Feb. 9, 2016) (footnote omitted). Like the district court in *Bhate*, it may be the case that some "of the impacts alleged by Plaintiff were the result of actions taken by the

Owner," obviating the present need for this Court "to address the appropriate characterization or assign fault for the actions that led to the impacts suffered by Plaintiff at this time." 2016 WL 544406, at *3.

In short, the record shows that the USACE *may* be responsible for issues identified by Kingston itself—such as the "no work zones" dispute, non-directional beacon work limitations, the communications line, the low-fly zone, the blast arc work area restriction, and the unforeseen conduit in the box culvert excavation and fill dispute—despite Kingston's present contention that Boland's mismanagement is 100% responsible. The Court expresses no opinion as to who is ultimately at fault for the delays and cost-overruns experienced on the Project—that is a question that is not properly before this Court in the first instance.

### C. **Exhaustion Of Contractual Remedies Is Required**

Subcontract Paragraph 13A is triggered where the government *may* be responsible, and no threshold quantum of responsibility is required. In a case interpreting the same contractual provision at issue here, another district court concluded that—

> [t]he word "may" indicates that the liability or responsibility of USACE need not be established for Paragraph 13A to apply, but instead the responsibility or liability need only be a possibility. *See* May, Black's Law Dictionary (10th ed. 2014) (defining may as "to be a possibility"); Merriam-Webster Dictionary Online, www.merriam-webster.com (last visited February 6, 2017) (defining may as "used to indicate possibility or probability").

15

*GLF Constr. Corp v. FEDCON Joint Venture*, 2017 WL 897852, at *2 (E.D. La. Mar. 7, 2017). *See also GLF Constr. Corp. v. FEDCON Joint Venture*, 2017 WL 2653126, at *2 (E.D. La. June 20, 2017) (denying motion for reconsideration) ("'Responsibility' is not qualified in the contract and there is no threshold; if USACE is even 1 percent responsible for the claim, then the provision applies.").

As was the case in the *FEDCON* matter, Kingston "has not negated the plausibility of USACE's responsibility [and] [t]herefore Paragraph 13A applies, and [it] is contractually bound to stay this litigation pending the completion of the applicable dispute resolution procedures." 2017 WL 897852, at *3. *See also United States of America, for the Use and Benefit of Barcelona Equipment, Inc. v. David Boland, Inc.*, 2014 WL 345293, at *2–*3 (E.D. La. Jan. 30, 2014) (Enforcing the "clear, unambiguous contractual language" of Subcontract Paragraphs 13A and 23, where two requests for equitable adjustment ("REA") were pending, and staying civil action "pending the complete and final resolution of the Prime Contract's contractual remedial procedure."). Because it *may* be possible that the government is responsible for Kingston's losses and there may be "an intertwined relationship between the Owner-related claims and those that rest solely between the parties. . . [t]he intertwined nature of the claims related to the Project supports [enforcement of the contractual dispute resolution process]." *Bhate,* 2016 WL 544406, at *3; *see also id.* at *3 ("Because the Subcontract requires exhaustion of

16

the [Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq*.] procedures for Owner-related disputes and Plaintiff has not demonstrated why this exhaustion is presently inapplicable, a stay of this matter is appropriate pending the outcome of the Owner-related claims.").

Kingston argues that it will be prejudiced if the contractual remedial procedure is enforced both because of the deleterious relationship between the USACE and Boland, and also because the process would only serve to delay and add expense to the ultimate resolution of the global dispute. *See* Mem. in Opp'n at 13–15; Dkt. No 133. Neither of these arguments compels a different result. First, on two prior occasions, Boland presented Kingston's claims pursuant to Paragraph 13A, where it was contractually obligated to do so.[7] Boland's counsel reaffirmed that obligation during oral argument. Second, although the economic strain of awaiting resolution of the contractual remedial procedure may be burdensome, it is "a reasonably foreseeable event under the Subcontract." *Bhate*, 2016 WL 544406, at *4. *See also United States v. Dick/Morganti*, 2007 WL 3231717, at *2 (N.D. Cal. Oct. 30, 2007) (Enforcing contractual dispute clause, holding that "where the unambiguous language of a subcontract provides for a stay, enforcing that language does not contravene the purposes of the Miller Act."); *id.* at *3 ("The subcontracts at

---

[7]*See* Subcontract Paragraph 13A ("Upon the Subcontractor's written request, the Contractor agrees to prosecute all claims submitted by the Subcontractor under the contractual remedial procedure of the Prime Contract on behalf of, and to the extent required by, the Subcontractor.").

issue do not establish a complete waiver of the subcontractors' right to bring a Miller Act claim. Rather, the subcontracts merely stay such a claim pending the completion of the administrative resolution process. It is clear that Congress intended such agreements to be binding notwithstanding § 3133(c)."); *United States of America, for the Use and Benefit of Barcelona Equipment, Inc. v. David Boland, Inc.*, 2014 WL 345293, at *2 (E.D. La. Jan. 30, 2014) ("Moreover, the cases cited by [the subcontractor] are inapposite as its Miller Act remedies have not been waived in this instance. While the Court understands [the subcontractor's] frustration, these provisions are clear and unambiguous and must be enforced."). Kingston itself agreed to the very procedure which it now claims is burdensome, costly, and/or futile and cannot be heard to complain under these circumstances.

The Court grants in part Defendants' Motion with respect to the enforceability of Paragraphs 13A and 23 of the Subcontract between Boland and Kingston.

## II. **Stay Rather Than Dismissal Is The Appropriate Remedy**

Defendants argue that Kingston's claims should be deemed waived under equitable theories including relinquishment and laches for failure to timely invoke the contractual administrative procedure, and alternatively, seek a stay pending

resolution of administrative proceedings.[8]  On balance, the Court finds a stay of the federal litigation to be appropriate, rather than dismissing the action, based on both the express terms of the contract and also in order to avoid piecemeal litigation and promote judicial efficiency.  *See Bhate*, 2016 WL 544406, at *4 ("An order staying this matter is supported not only by the contract, but also the promotion of judicial economy and efficiency.").

In sum, Kingston's Miller Act remedies remain intact pending exhaustion of Paragraph 13A's contractual remedial procedure and subject to Paragraph 23's stay provision.  In light of this stay, the Court further orders the parties to jointly submit, in six-month intervals, a report on the status of proceedings.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is GRANTED IN PART.  This matter is hereby STAYED until a final decision is rendered in any administrative proceeding and any appeal therefrom, or

///

///

---

[8]Because it finds a stay of this matter to be appropriate under the circumstances, the Court does not reach the merits of Defendants' equitable arguments at this time, including those relating to waiver.

pending further orders from this Court. The parties shall jointly file a semi-annual report updating the Court on the status of those proceedings.

IT IS SO ORDERED.

DATED: August 30, 2017 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*Kingston Environmental Services, Inc., et al. v. Boland, Inc. et al.*, CV NO. 16-00205 DKW-RLP;
**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND STAYING CASE**