IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES, for the use and benefit of KINGSTON ENVIRONMENTAL SERVICES, INC.<br><br>Plaintiff,<br><br>vs.<br><br>DAVID BOLAND, INC., *et al.*,<br><br>Defendants. | Case No. 16-cv-00205-DKW-WRP<br><br>**ORDER DENYING DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This action arises out of an infrastructure construction project at Wheeler Army Airfield in Oahu, Hawaii. The prime contractor hired by the federal government, Defendant David Boland, Inc., retained Plaintiff Kingston Environmental Services, Inc., as a subcontractor to perform part of the work. By all accounts, there were numerous problems during the construction. Kingston brings this lawsuit under the Miller Act, 40 U.S.C. Sections 3131–34, and holds Boland responsible for the construction delays that occurred and the losses it allegedly suffered as a result.

In 2017, this Court granted in part Defendants' motion for summary judgment, stayed the case until Kingston had complied with the remedial administrative procedures in the subcontract, and reserved ruling on the issue of whether Kingston's claims were barred by the "no damages for delay" provision in the subcontract. Dkt.

No. 145. Now that the stay has been lifted, this matter is before the Court on Defendants' renewed motion for summary judgment as to the enforceability of the "no damages for delay" provision. Dkt. No. 185. Because enforcement of the "no damages for delay" provision hinges on material facts disputed by the parties, Defendants' motion is DENIED.

## FACTUAL & PROCEDURAL BACKGROUND

### A. Relevant Factual Background

On June 29, 2012, the United States Army Corps of Engineers (USACE or Government) entered into a contract with Defendant David Boland, Inc., (Boland), making Boland the primary contractor for a construction project known as the Combat Aviation Brigade Infrastructure, Phase I, Wheeler Army Airfield, Oahu, Hawaii (the Project).[1] In November of 2012, Boland and Plaintiff Kingston Environmental Services, Inc., (Kingston) entered into a subcontract agreement (the Subcontract), valued at more than $15.8 million. Dkt. No. 116-2 at 1. Under the Subcontract, Kingston agreed to perform part of the work on the Project and furnish the necessary labor, materials and equipment to do so. Dkt. No. 116-2 at 13.

---

[1] Dkt. No. 116, ¶ 1; Dkt. No. 116-1, ¶ 3; Dkt. No. 134 at 1. Defendant Western Surety Company (Western Surety) issued Miller Act performance and payment bonds for the Project on behalf of Boland. *See* Compl., Dkt. No. 1, ¶¶ 10–11; Boland's Answer, Dkt. No. 32, ¶¶ 10, 11.

Roughly a month after mobilizing, Kingston encountered obstacles. First, Kingston was unable to use its preferred labor force. Dkt. No. 116-4, ¶ 13. In particular, an internal email at Kingston states:

> We need the union agreement signed so we can supplement CAB/TEMF with our Seattle labor. Without some of our talents our [sic] in the machines and working/pushing the locals, we are and will continue to spend upwards of 50% more than necessary in my limited opinion.

*Id.* Second, Kingston ended up procuring rental equipment and labor at much higher rates than it had accounted for.[2] Kingston, for instance, rented a 25-ton truck at $94.13 per hour and an excavator at $84.69 per hour, when Kingston had bid, respectively, $50.71 per hour and $37.78 per hour. Dkt. No. 116-4 at ¶ 14. Further, on April 12, 2013, Kingston hired Delta Construction Company to perform part of its work and to be compensated on a "time and materials" basis. *Id.* at ¶ 15. Delta's hourly costs again substantially exceeded what Kingston had projected. *Id.* at ¶¶ 16–17.[3] To make matters worse, Kingston installed sanitary sewer manholes that did

---

[2] Dkt. No. 116-4, ¶ 14; Dkt. No. 134-1 at 49–50; Dkt. No. 134-17 at 28–29.
[3] The specific cost differences are telling. Boland's consultant in this case provided the following table that does not appear to be in dispute. *See* Dkt. No. 116-4 at 8.

| Delta Equipment | Sub Rate | Kingston Equipment | Bid Rate |
|---|---|---|---|
| 769D Haul Truck | $239.47 | RT Truck 35T | $156.79 |
| CAT Excavator | $390.29 | JD 600 Excavator | $190.92 |
| HIT 350 Excavator | $251.60 | JD 350 Excavator | $137.86 |
| CAT D6R Dozer | $219.79 | JD 850 Dozer | $147.06 |
|  |  |  |  |
| Laborer | $104.42 | Laborer | $57.65 |

not conform to the Project's specifications, and the USACE consequently rejected them, causing Kingston to have to replace them.[4] Kingston does not contest that these events occurred or that it incurred these costs. Dkt. No. 134, ¶¶ 11–13, 18. Nevertheless, Kingston maintains that Boland mismanaged the Project and hindered the progress of Kingston and other subcontractors. Dkt. No. 134, ¶ 10.[5] According to Kingston's expert, Boland caused Kingston to incur cost overruns of $6,882,738. Dkt. No. 134-3.

By March 2014, Kingston had completed approximately 46% of the work it agreed to perform. Dkt. No. 134-2, ¶ 8. On March 6, 2014, Boland and Kingston

---

[4] Dkt. No. 116, ¶ 18; Dkt. No. 116-1, ¶ 13. As a result of the non-conforming manhole covers, Boland sponsored a claim by Kingston against the Government, seeking $3.5 million under the doctrine of economic waste. Dkt. No. 116, ¶ 18. That claim was denied by USACE and subsequently appealed to the U.S. Court of Federal Claims. *Id.*

[5] Bob Wysocki, Kingston's General Manager, describes a smorgasbord of grievances against Boland. Dkt. No. 134-2 ¶¶ 4–7. These include allegations that, *inter alia*, Boland "continuously prevented Kingston from working in an orderly manner"; "prevent[ed] Kingston from accessing construction areas as planned"; "add[ed] unexpected restrictions to the work"; "fail[ed] to identify no-work areas prior to contracting with Kingston"; "fail[ed] to timely or diligently address and resolve issues to allow Kingston's work to proceed"; "fail[ed] to complete other activities on site that disrupted and negatively impacted Kingston in the performance of its work"; "unreasonably revis[ed] safety requirements"; "exhibit[ed] constant indecision"; "fail[ed] to manage and facilitate a productive relationship with the USACE"; "chang[ed] site access points due to incomplete Boland work"; "fail[ed] to have areas ready for Kingston to perform its work"; "constantly direct[ed] [*sic*] to perform work in a piecemeal fashion and in different areas of the site, causing disruption of Kingston's work forces"; "redirect[ed] Kingston's planned work"; "fail[ed] to develop a coherent schedule"; "fail[ed] to update the schedule in a timely and organized manner"; "fail[ed] to let subcontractors have access to and review the schedule"; "fail[ed] to work with the subcontractors to timely achieve resolution of issues as they came up on the Project"; "artificially manipulate[ed] schedules"; had "excessive turnover"; "lack[ed] communication and behave[ed] slowly and incompletely when transmitting information gained in meetings with the USACE"; and "had Kingston skipping around the site performing work in a piecemeal fashion and putting out fires that Boland had created." *Id.*

revised the Subcontract by executing Change Order No. 10, under which, *inter alia*: (a) the scope of the work Kingston was to perform was reduced by over $8.4 million; and (b) Boland and Kingston "waiv[ed] and release[ed]" any claims they had against each other "resulting directly from delays in performance . . . and the schedule impacts of such delays caused [at] any time prior to the date" of Change Order No. 10.[6] The claims the contracting parties mutually released, however, did not include "any claims related to delays" for which Kingston had "previously notified [Boland] in writing . . ." Dkt. No. 116-3 at 9, Section X.

Boland and Kingston later revised the Subcontract on at least three separate occasions by executing three additional Change Orders—Change Order Nos. 12, 13, and 14—which were respectively executed on June 20, 2014, September 5, 2014, and September 22, 2015.[7] The cumulative effect of Change Order Nos. 12–14 was to increase the amount Kingston was to be paid by $338,357.95. *See* Dkt. No. 116-1 at 90–93. Each of these Change Orders stated that "[Kingston] acknowledges that all claims for additional time, impact, delay, and/or disruption have been included in the revised subcontract amount." *Id.*

---

[6]*See* Dkt. No. 116-3 at 2; *id.* at 9, Section X; Dkt. No. 116-1, ¶ 14; Dkt. No. 134-2, ¶¶ 8–9.
[7]Dkt. No. 116-1, ¶ 15; *id.* at 90–93. The Court notes that although Craig Hildebrandt, Vice President of Operations for Boland, stated in his declaration that Change Order No. 14 was executed on September 22, 2014, Dkt. No. 116-1, ¶ 15, this appears to be a clerical error because the Change Order states it was "entered into this 22nd day of *September, 2015*." Dkt. No. 116-1 at 92.

- 5 -

## B.     Procedural History

Kingston filed this action on April 29, 2016, seeking payment from Western Surety under its Miller Act bonds (Count I) and alleging that Boland breached the Subcontract (Count II). Dkt. No. 1, ¶¶ 38–50. Boland and Western Surety moved for partial summary judgment, arguing that: (1) Kingston failed to comply with the administrative remedial procedure mandated in Paragraph 13A of the Subcontract; and (2) Kingston's delay claims are barred by the "no damage for delay" clause in Paragraph 12.B of the Subcontract.[8] Dkt. No. 145 at 7; Dkt. No. 185 at 3–4. On August 30, 2017, the Court granted Defendants' motion as to the first issue, reserved ruling on the second issue, and stayed the case pending the outcome of the remedial procedure in Paragraph 13A of the Subcontract. Dkt. No. 145 at 8.

Once the stay was lifted on June 28, 2019 (Dkt. No. 178), Defendants renewed their motion for partial summary judgment on the issue of the enforceability of the "no damages for delay" provision in the Subcontract, and incorporated the briefing and argument submitted as part of their initial motion for partial summary judgment. Dkt. No. 185 at 5. Plaintiffs agreed that the matter was "procedurally ripe" and should be decided on the briefing and oral argument previously submitted. Dkt. No.

---

[8]Defendants initially asserted a third argument; namely, that Kingston had not satisfied the legal requirements for damages based upon a modified total cost claim theory. Dkt. No. 115-1 at 16–26. Defendants, however, withdrew this argument at the hearing on August 25, 2017, Dkt. No. 139, and thus the Court did not address the issue in its Order. Dkt. No. 145 at 7 n.4.

188.  As a result, the Court took the matter under submission without any further briefing or argument.  Dkt. No. 189.

## STANDARD OF REVIEW

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A *genuine* issue of *material* fact exists when, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249; *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  "[A] complete failure of proof concerning an essential element" of a claim "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

"A moving party without the ultimate burden of persuasion at trial"—such as Boland in this case—"has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To meet its initial burden, the moving party must either: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) "demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element"

of its claim at trial. *Celotex*, 477 U.S. at 331; *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015); *cf.* Fed.R.Civ.P. 56(c).

Once the movant has done so, the opposing party cannot rely on the mere hope that the trier of fact will disbelieve the movant's evidence, but instead "must present affirmative evidence" in order to avoid summary judgment. *See, e.g.*, *Anderson*, 477 U.S. at 256–57; *Teamsters Local Union No. 117 v. Wash. Dep't of Corr.*, 789 F.3d 979, 994 (9th Cir. 2015); Fed.R.Civ.P. 56(c)(1). This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). By the same token, "evidence [that] is merely colorable, or is not significantly probative" is not enough, *Anderson*, 477 U.S. at 249–50, and "a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 252. To the extent probative, supporting evidence does exist, it must be "set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("General references without page or line numbers are not sufficiently specific.").

Although a court may consider evidence in the record not cited by the parties, Fed.R.Civ.P. 56(c)(3), "it is not [the court's] task . . . to scour the record in search of a genuine issue of triable fact." *Californians for Renewable Energy v. Cal. PUC*,

922 F.3d 929, 936 (9th Cir. 2019) (citations and internal quotation marks omitted); Fed.R.Civ.P. 56(c)(1)(a) (providing that a party "must support [its] assertion[s] by citing to particular parts of materials in the record, including depositions"); Fed.R.Civ.P. 56(c)(3) (a "court need consider only the cited materials").

## DISCUSSION

The only issue before the Court is whether Kingston's delay claims are barred by the "no damages for delay" provision in Paragraph 12.B of the Subcontract. That provision states:

> The Subcontractor expressly agrees that the Contractor shall not be liable to the Subcontractor for any damages or additional costs, whether foreseeable or unforeseeable, resulting in whole or in part from a delay, hindrance, suspension, or acceleration of the commencement or execution of the Work, caused in whole or in part by the acts or omissions, whether negligent or not, of the Contractor, including other subcontractors or material suppliers to the Project, its agents, employees, or third parties acting on behalf of the Contractor. **The Subcontractor's sole remedy for any such delay, hindrance, suspension, or acceleration shall be a noncompensable time extension.**

Dkt. No. 116-2 at 6–7 (emphasis added). The parties agree that the issue is governed by Florida law,[9] and that under Florida contract law, "no damages for delay"

---

[9] *See* Dkt. No. 115-1 at 2, 15; Dkt. No. 134 at 16; Dkt. No. 116-2, ¶ 31 (choice-of-law provision in the Subcontract providing that Florida law governs). The Court notes that neither party addressed the impact the Miller Act may have on the validity of terms in the Subcontract. *See United States ex rel. Walton Tech. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1205–09 (9th Cir. 2002). As such, the Court will not address whether the "no damages for delay" clause is "void" under the Miller Act because it "plainly affects [a subcontractor]'s right to recovery of increased out-of-pocket costs caused by construction delays" and contravenes "the requirements for a valid waiver under [40 U.S.C. Section 3133(c)(3) of] the Miller Act." *See, e.g., United States*

- 9 -

clauses—such as the provision in question—are generally valid and enforceable. Dkt. No. 115-1 at 15; Dkt. No. 133 at 15–16.[10] The parties also agree, however, that such clauses are unenforceable "if the delays were occasioned by the [contractor]'s fraud, concealment, or active interference with [the subcontractor]'s performance under the contract." *Marriott Corp.*, 26 F.3d at 1067–68; *cf.* Dkt. No. 115-1 at 15; Dkt. No. 133 at 15–16; *see also Triple R Paving, Inc. v. Broward County*, 774 So. 2d 50, 55–60 (Fla. 4th Dist. Ct. App. 2000) (delays occasioned by "utility relocation" and "detention pond elevation" were barred by the delay clause, but project designer's "knowledge of [a] design flaw" and "failure to apprise [contractor] of the problem" were sufficient to overcome the bar); *McIntire v. Green-Tree Communities, Inc.*, 318 So. 2d 197, 199–200 (Fla. 2d Dist. Ct. App. 1975) (delay clause ineffective where "circumstances which caused the delay were brought about by [the contractor] and were even foreseen but concealed by [the contractor] when the contract was made"); *Southern Gulf*, 238 So. 2d at 459 (no damage for delay clause ineffective where there was a "knowing delay" that "transcend[ed] mere lethargy or bureaucratic bungling").

---

*ex. rel McCullough Plumbing, Inc., v. Halbert Constr. Co., Inc.*, No. 17-CV-803-CAB-WVG, 2018 WL 6601844, at *4–5 (S.D. Cal. Dec. 17, 2018) (applying *Walton Tech.*); *United States v. John C. Grimberg Co.*, 283 F. Supp. 3d 476, 482, 484–85 (E.D. Va. 2017) (relying on *Walton Tech.* to reach the same result).

[10]*See, e.g., Marriott Corp. v. Dasta Constr. Co.*, 26 F.3d 1057, 1067 n.17 (11th Cir. 1994) (citing *inter alia*, *Southern Gulf Util., Inc. v. Boca Ciega Sanitary Dist.*, 238 So. 2d 458, 459 (Fla. 2d Dist. Ct. App. 1970); *C.A. Davis, Inc. v. City of Miami*, 400 So. 2d 536 (Fla. 3d Dist. Ct. App. 1981)).

Kingston maintains that this case falls within the exception to the rule that delay clauses are enforced. Dkt. No. 133 at 15–16, 27.[11] Boland, on the other hand, argues that there is no evidence in the record to support a finding that Boland knowingly delayed Kingston or actively interfered with Kingston's work. Dkt. No. 115-1 at 16.

At the outset, it bears emphasis that "whether a party has actively interfered with another party's contractual obligation is a question usually inappropriate for resolution at the summary judgment stage" because the issue is "highly case-specific and fact intensive." *United States ex rel. Dura-Stress, Inc. v. David Boland, Inc.*, No. 6:05-cv-549-Orl-19JGG, 2006 WL 2683304, at *4 (M.D. Fla. Sept. 18, 2006) (collecting cases). Although not binding, *Dura-Stress* involved facts similar to this case and the reasoning in *Dura-Stress* is persuasive. There, the government

---

[11]Kingston also asserts that Boland was "the first to breach the Subcontract," and thus "Boland is prohibited from seeking enforcement of any provisions of the Subcontract, including but not limited to the 'no damages for delay' clause." Dkt. No. 133 at 15; *id.* at 9–10. But that theory is contrary to basic principles of contract law. Even assuming, *arguendo*, that Boland committed a *material* breach, "[w]hen one party to a contract commits a material breach," the nonbreaching party has the option to treat the breach as "an entire or total breach." *Forbes v. Prime Gen. Contrs., Inc.*, 255 So. 3d 448, 451 (Fla. 2d Dist. Ct. App. 2018) (quoting *Hyman v. Cohen*, 73 So. 2d 393, 397 (Fla. 1954)). "[T]here are two main consequences of that decision: (1) the nonbreaching party may suspend his or her own performance of the contract, *see Rector v. Larson's Marine, Inc.*, 479 So. 2d 783, 785 (Fla. 2d DCA 1985), and (2) the nonbreaching party can elect one of two damage remedies in a suit for breach." *Id.* Reaping the benefits of the contract and invalidating all of the breaching party's rights under the contract is not an option. *See id.*; *see also* 13 ARTHUR L. CORBIN AND JOSEPH M. PERILLO ET AL., CORBIN ON CONTRACTS § 68.2 (Matthew Bender & Co., Inc., ed. 2019) ("Being guilty of a wrong does not make the breaching party an outlaw or deprive the breaching party of all rights, even the rights created by the very contract that is broken.").

described Boland as having a "cavalier attitude" and that Boland had exhibited performance that was "substandard." *Id.* at *5. Further, the parties disputed whether Boland failed to "timely and adequately respond" to the subcontractor's requests for information and whether Boland "knowingly contribut[ed] to a lengthy delay in the installation of the pilings" by failing to have the site ready for the subcontractor. *Id.* at *4–5. As a result, the court ultimately concluded that summary judgment was inappropriate because the parties disputed several facts pertaining to whether Boland engaged in active interference with the subcontractor's performance. *Id.* at *4, *6.

The situation and result here are no different than in *Dura-Stress*. The parties dispute facts that are relevant to the enforceability of the "no damages for delay" provision, and viewing the evidence in the light most favorable to Kingston, a jury could conclude that Boland knowingly delayed, or actively interfered with, Kingston's performance.

First, there is evidence in the correspondence between USACE and Boland to overcome the "no damages for delay" clause. Just as the government described Boland as having a "cavalier attitude" in *Dura-Stress*, here the USACE stated that Boland had an "unresponsive attitude." Dkt. No. 134-10 at 2. The USACE also noted that (1) Boland's "project schedules are fatally flawed" because they contain "erroneous logic ties, inaccurate scope of work, and unrealistic activity durations," and therefore "cannot be utilized as an accurate and reliable tool"; and (2)

"[Boland]'s poor schedule management has been and continues to be a major detriment to the project." Dkt. No. 134-7 at 1–2. USACE later scorned Boland for continuing "to manipulate the schedule logic and durations to minimize and eliminate ***the known Contractor caused delays*** while conversely exaggerating potential Government impacts." Dkt. No. 134-5 at 2 (emphasis added). USACE went on to explain that "[t]hese tactics are deceitful, unethical, and detrimental to the satisfactory progress of the project" and "despite several letters and numerous discussions, [Boland] continues with this practice." *Id.* In fact, Boland received an overall "unsatisfactory" rating in its 2014–2015 performance review, on the basis that, *inter alia*, Boland "does not submit the daily Quality Control reports within the specified timeframe"; Boland "does not adequately schedule their work"; "[Boland] does not take appropriate corrective action . . . when the schedule has slipped due to their own inefficiencies"; "[Boland] does not furnish updated project schedules on a timely basis"; and "Misinformation is contained in [the] schedules." Dkt. No. 134-6 at 3–6.

Second, Bob Wysocki, the General Manager for Kingston, testified that Boland "knowingly and willfully" prevented Kingston from performing its contractual obligations. *See supra* note 5; Dkt. No. 134-2 at ¶¶ 4–7. For instance, Wysocki testified that Boland, "prevent[ed] Kingston from accessing construction areas as planned"; "fail[ed] to timely or diligently address and resolve issues to allow

Kingston's work to proceed"; "fail[ed] to complete other activities on site that disrupted and negatively impacted Kingston in the performance of its work"; "chang[ed] site access points due to incomplete Boland work"; and, as in *Dura-Stress*, "fail[ed] to have areas ready for Kingston to perform its work." *Id.* at ¶ 4; *Dura-Stress*, 2006 WL 2683304, at *5.

These facts support the inference that Boland's conduct was more than "mere lethargy or bureaucratic bungling." *Southern Gulf*, 238 So. 2d at 459; *McIntire*, 318 So. 2d at 199–200. As such, the evidence is enough for a jury to find that Boland "willfully and knowingly delayed" Kingston's ability to perform under the contract. *See Newberry Square Dev. Corp. v. Southern Landmark, Inc.,* 578 So. 2d 750, 752 (Fla. 1st Dist.Ct.App.1991) (concluding "no damage for delay" clause did not preclude plaintiff's recovery because the evidence that defendant "delayed in executing change orders and required that construction not proceed without such orders [and] . . . repeatedly failed to make timely payments required by the contract" was "adequate evidence to present a jury question as to whether [defendant] actively impeded, or willfully and knowingly delayed, [plaintiff]'s ability to timely perform under the contract"). Of course, Boland disputes the veracity of the charges that it engaged in such conduct. Dkt. No. 115-1 at 16.[12] But "[c]redibility determinations,

---

[12] To the extent Boland argues that even if the "no damages for delay" clause is unenforceable, Kingston waived and released any claims for delay when it executed Change Order Nos. 10, 12, 13, and 14, *see* Dkt. No. 115-1 at 11–14; Dkt. No. 135 at 17–19, that is an argument Boland has

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255; *see also Bourjaily v. United States*, 483 U.S. 171, 179–80 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."). Thus, issues of fact preclude summary judgment.

Having carefully reviewed the record in the light most favorable to Kingston, the Court is convinced that a jury trial is warranted. Material questions of fact exist as to whether Boland "knowingly delayed," or "actively interfered" with, Kingston's performance under the Subcontract so as to overcome the "no damages for delay" provision in the Subcontract. Boland's motion is therefore DENIED.

## **CONCLUSION**

For the reasons set forth herein, Defendants' Renewed Motion for Partial Summary Judgment (Dkt. No. 185) is DENIED.

IT IS SO ORDERED.

DATED: November 20, 2019 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

---

not comprehensively developed. In particular, the interplay and timing of Paragraph 12.B of the Subcontract and Change Order Nos. 10, 12, 13, and 14 is territory into which this Court declines to venture unless and until the issues are fully briefed.